**210 EAST 86TH STREET CORP., Plaintiff,**

v.

**COMBUSTION ENGINEERING, INC., et al., Defendants.**

**PARK COMCAR ASSOCIATES, et al., Plaintiffs,**

v.

**COMBUSTION ENGINEERING, INC., et al., Defendants.**

**Nos. 87 Civ. 6497 (VLB), 87 Civ. 6498 (VLB).**

United States District Court, S.D. New York.

March 31, 1993.

---

David B. Turret, Julien & Schlesinger, New York City, for plaintiffs.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for Lac d'Amiante du Quebec, Ltee; Thomas Fenerty, of counsel.

Picillo, Bromberg & Caruso, Fairfield, NJ, for Basic Inc. and Combustion Engineering, Inc.; Arthur D. Bromberg, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for Flintkote Co.; Gary E. Crawford and Bert L. Wolff, of counsel.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Asbestospray Corp., Asbestos Products Mfg. Corp. and Spraycraft Corp.; E. Paul Dougherty and Robert Joyce, of counsel.

Winick & Rich, Hackensack, NJ, for Asbestos Corp., Ltd.; Abraham Y. Skoff, of counsel.

James W. Harbison, Morgan, Lewis & Bockius, New York City, for defendants.

Calinoff & Katz, New York City, for Proko Industries, Inc.; Arnold Katz and Leejanice Tobak, of counsel.

Danaher, Tedford, Lagnese & Neal, P.C., New York City, for U.S. Mineral Products Co.; Paul Slater, of counsel.

Dechert Price & Rhoads, New York City, for ACandS, Inc.; Jeffrey S. Lyons, of counsel.

Gollatz, Griffin, Ewing & McCarthy, Philadelphia, PA, for ACandS, Inc.; Michael V. Gilberti, of counsel.

Haythe & Curley, New York City, for T & N plc. and J.W. Roberts Ltd.; Charles E. Dorkey, III and Todd L. Schleifstein, of counsel.

Holtzmann, Wise & Shepard, New York City, for Georgia–Pacific Corp.; David R. Foley and David J. Freeman, of counsel.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

These cases, involving suits against a large number of firms allegedly involved directly or indirectly in various stages of asbestos mining, manufacturing or distribution, are before me on a Report and Recommendation of United States Magistrate Judge Kathleen A. Roberts dated December 9, 1992 recommending the grant of summary judgment to the moving defendants. The products of the defendants in these cases have not been specifically traced to plaintiffs' premises.

For the reasons set forth by the Magistrate Judge and the further reasons which follow, I approve and adopt her Report and Recommendation, overrule plaintiffs' objections to it, and grant summary judgment dismissing the complaint as to the moving defendants.[1] The full caption of these cases is set forth as Appendix A to this memorandum order.

Plaintiffs are directed to show cause within 30 days of the date of this memorandum order why this case should not be dismissed as to the remaining defendants.

## II

Plaintiffs have failed to show that any specific moving defendants were responsible for asbestos reaching their premises. Instead, they argue that such specific identification is difficult or impossible, and that the possibility that these defendants were responsible, together with their participation in varying aspects of asbestos mining, manufacturing, or distribution, is sufficient to support this lawsuit. In support of this contention, plaintiffs urge various approaches to determining so-called "alternative liability," based on market share, participation in illegal activities, concerted action, conspiracy, and/or contributory causation of harm. These contentions are discussed in detail in Magistrate Judge Roberts' Report and Recommendation at 40–55. I need not repeat her analysis; I incorporate her Report and Recommendation and make it part of this memorandum order.

## III

Plaintiffs' objections to Judge Roberts' Report and Recommendation rely in part on *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989),

*cert. denied* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989). In that case the New York Court of Appeals indicated that while "it may be fair to employ alternative liability in cases involving only a small number of potential wrongdoers, that fairness disappears with the decreasing probability that any one of the defendants actually caused the injury."[2] Given the number of entities involved in one or another aspect of the asbestos industry, all of whom might be liable according to plaintiffs' theory, *Hymowitz* would support adoption of Judge Roberts' recommendation to dismiss the case.

Plaintiffs also rely on *In re Agent Orange Product Liability Litigation*, 597 F.Supp. 740, 823 (E.D.N.Y.1984) which concerned the herbicide Agent Orange, but which mentioned asbestos cases as potentially suitable for allocation of percentages of harm caused by industry members. As pointed out by Judge Roberts in her Report and Recommendation at 40–43, market share liability has been rejected in all asbestos cases to date for numerous practical reasons, including the fact that asbestos is not a unitary product with identical content, as is DES or Agent Orange.

■ Even more important may be that those in the manufacturing and distribution phases of the pharmaceutical and insecticide industries can be held to knowledge of the precautions required in connection with their products. Through its regulatory requirements, Congress has made it clear to manufacturers and distributors in such industries that they are responsible for careful treatment of their wares. See *United States v. Generix Drug Corp.*, 460 U.S. 453, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983). Where controlled items are involved, adverse inferences

1. The names of the moving defendants are set forth in footnote 1 of the Report and Recommendation, which is attached as Appendix A to this Memorandum Order. The full captions of these cases are set forth on Appendix A to this memorandum order. Copies of the Report and Recommendation, having already been furnished to the parties, are not included in the copies of this memorandum order sent to those listed at the foot of this memorandum order.

2. The impracticability of conducting litigation which would reach final judgment if litigated

through trial increases with the potential inclusion of every member of a multi-phase industry which is not limited to a particular licensed or approved product such as a pharmaceutical. This factor of impracticability cannot be invoked to bar justice where a party is entitled to relief, but may be pertinent where borderline decisions must be made concerning whether a given type of matter should be handled in a particular way. See, e.g., *Colligan v. Activities Club*, 442 F.2d 686, 692–93 (2d Cir.), *cert. denied* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971).

supporting liability can be drawn from irresponsible behavior. *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). Where, as here, however, there is no showing that those sought to be held liable had reason to regard the product involved as a staple with particular hazards, such inferences are inappropriate. *United States v. Falcone*, 109 F.2d 579 (2d Cir.), *aff'd* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

Plaintiffs have not argued that during the periods when it was placed in their buildings, asbestos was generally known to be a hazardous item. There is no indication that asbestos was generally recognized by defendants here or by the public at the time involved as an item which carried risks calling for further inquiry or special caution.

## IV

Plaintiffs claim, however, that some members of the asbestos industry knew of risks connected with asbestos and acted to suppress information with respect to that knowledge during a period from the 1930s into the 1950s. They base that claim largely on B. Castleman, *Asbestos: Medical and Legal Aspects* 681–88 and documentary appendix at 263–270. In *Solow v. W.R. Grace & Co.*, Index No. 2453/88, Sup.Ct.N.Y.Co., 7/1/89, 1090 NY Misc LEXIS, Justice Harold Baer, Jr.[3] recognized that conspiratorial efforts to suppress knowledge of risks concerning a product could be actionable, but dismissed the complaint because of absence of specific allegations that the named defendant in that case was involved in the alleged conspiracy.

The New York Court of Appeals has endorsed a market share approach as to one defendant in a DES case involving failure to test a product; the court's rationale was that overlooking the failure to test a powerful pharmaceutical product would encourage other companies to act imprudently or improperly. *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982).

Dissemination of asbestos at a time when industry members should have realized that asbestos posed hazards is specifically claimed by plaintiffs in this case only in regard to U.S. Gypsum, based on exhibits cited in plaintiff's objections at 7, footnote 7. Those exhibits, derived from Castleman's study, do not appear to mention Gypsum by name, although entities mentioned in them may have been affiliated with Gypsum in ways not traceable from the materials cited by plaintiffs in their objections to Judge Roberts' recommendations.

Cognizable under *Solow* and *Bichler* would be a claim for damages traceable to deliberate concealment by a defendant member of an industry; also cognizable would be a claim against an industry member that downstream injury, directly administered by another party, was triggered by concealment by the industry member of serious risks concerning a product, contributing to harm to the plaintiffs. See also *Nicolet v. Nutt*, 525 A.2d 146 (Del.1987). In an industry in which it is foreseeable that one actor can and will rely on what has been learned by others about hazards,[4] deafening silence where an alarum would be required or expected can be highly misleading.[5] But on the present mo-

---

**3.** Judge Baer's decision remains unreported and hence not more generally available to the bench, bar or public, presumably because the State Reporter has not elected to publish it in the New York Miscellaneous Reports, and New York Judiciary Regulations ch. VII (1986) prohibits state court jurists from sending opinions even to private publishers other than a named daily publication unless published in the official reports. LEXIS presumably obtained the decision from the clerk's office.

**4.** See *Burroughs Wellcome v. Schweiker*, 649 F.2d 221 (4th Cir.1981) (published studies reflecting testing by one pharmaceutical manufacturer can be relied upon by others); see also the subse-

quently enacted Waxman–Hatch Drug Price Competition and Patent Term Restoration Act, Pub. Law 98–417, 98 Stat. 1585 (1984).

**5.** Inferences from silence where a statement would be expected are well recognized where no Fifth Amendment privilege would be violated. See *Interstate Circuit v. United States*, 306 U.S. 208, 225–26, 59 S.Ct. 467, 473–74, 83 L.Ed. 610 (1939); *Brink's, Inc. v. City of New York*, 717 F.2d 700 (2d Cir.1983).

The concept of misleading silence has been most fully developed in the securities field. See generally discussion in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). It is of general applicability where a

tion for summary judgment, no specific evidence has been shown sufficient to create a genuine issue of material fact with respect to liability on the part of the particular defendants sued. It was the duty of plaintiffs to make such a showing or to indicate specifically what further discovery might enable them to make it, if they were to survive defendants' motions. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## V

As outlined in Judge Roberts' careful analysis in her Report and Recommendation, authority does not favor permitting lawsuits to proceed against parties without traceable responsibility where there is no evidence of specific deliberate wrongdoing on their part, and where the product involved was not generally known as hazardous at the time of their possible involvement. Courts, however, can and do confront new dilemmas with innovative remedies where the need for those remedies flows from, rather than contradicts, prior principle. In concluding that this is not a case calling for extension of legal liability to the outer limits—an extension which would be necessary to sustain plaintiffs' position—I am mindful that this leaves building owners without recourse to the asbestos industry for harm caused by the product where the source of asbestos in the buildings cannot be traced.

But imposing costs on those who may not have caused the harm is problematic. And to impose monetary costs on parties acting in good faith who had no reason to believe that their product was hazardous or defective, and who were not negligent, would have a chilling effect on legitimate activity with enormous

costs and risks to the public. The extension of legal liability beyond fault to behavior which causes damage has long been accepted in various contexts as part of the cost of doing business. Where, however, an extension of the reach of lawsuits is urged which may result in enormous exposure to those who have had no warning,[6] the question of whether there should be an extension must be approached with care.

Thus in some situations legislative remedies have been crafted which do not involve conventional suits for damages, as in the case of the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa–1 et seq.; see Hagan, *Vaccine Compensation Schemes*, 45 Food Drug Cosm.L.J. 477 (Sept. 1990); Dobreff, *National Vaccine Compensation Act*, 69 Mich.B.J. 806 (1990); see also, Pub.Law No. 97–395, 96 Stat. 2001 (1982) (relating to children's sleepwear).[7]

While it is the function of the legislative and executive branches of government to determine what alternate approaches may be adopted, the fact that alternatives to lawsuits are possible is relevant, and suggests that courts should hesitate to strain traditional concepts to encompass problems at the limits of their reach.

## VI

■ As is obvious from Judge Roberts' report, considerable factfinding has already taken place concerning the possible connection of each defendant to the plaintiffs' buildings. Plaintiffs assert in general terms that additional discovery concerning the asbestos industry is needed, but they fail to specify what such discovery would show that would avoid the conclusions reached by Judge Roberts. Under Fed.R.Civ.P. 56(f), this is insuf-

knowledgeable party, aware that others will necessarily rely on its communications or lack thereof, elects to keep silent in a way that leads them astray. See *Carlson v. GM Corp.*, 883 F.2d 287 (4th Cir.1989), *cert. denied* 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 287 (1990); *Martin v. Joseph Harris Co.*, 767 F.2d 296 (6th Cir.1985); *State v. GMC*, 120 Misc.2d 371, 466 N.Y.S.2d 124 (Sup.Ct.1983); Restatement (Second) of Torts § 551 (1979).

**6.** Where extremely large retroactive financial burdens were imposed for nonpayment of over-

time for time spent reaching a work site after entry onto the employer's premises, Congress acted to block further impositions of such liability, a step upheld in *Battaglia v. General Motors*, 169 F.2d 254 (2d Cir.), *cert. denied* 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).

**7.** In other situations, technology assessment leading to avoidance of placing what are discovered to be problematic products into further circulation, or developing substitutes for them, may be considered. See 42 U.S.C. § 6683(d); 10 U.S.C. § 2508.

ficient to avoid summary judgment. Specific depositions or documentation have not been pinpointed which might uncover concealment by named defendants of risks from asbestos. See *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919 (2d Cir.1985); *Contemporary Mission, Inc. v. USPS*, 648 F.2d 97 (2d Cir.1991).

## VII

Plaintiffs' chronology of alleged concealment of asbestos risks is also troublesome. The Castleman book, the only source cited by plaintiffs even indirectly in their objections to Judge Roberts' Report and Recommendation, is only quoted in regard to events more than 30 years ago. While limitations are tolled by concealment, at some point events are so far back that historical factfinding becomes extremely difficult,[8] especially under constraints imposed by the Federal Rules of Evidence where legal liability is alleged. Moreover, damage awards would not draw upon the assets of actual wrongdoers, but only on those of persons with little if any connection to the events involved. While in some cases legal redress for long-past wrongs has been authorized, such redress is recognized as problematic and is understandably controversial within the legal system.[9]

A yawning gap exists in plaintiffs' assertions as to the period since 1960, and no specific discovery has been identified which is designed to fill that gap. While open-ended exploration of past events is important historically, it can be pursued under the federal discovery rules with their inherent costs and limitations only upon a clear showing of need and of a reasonable likelihood that the exploration will lead to admissible evidence, a showing absent here.

## VIII

The boundaries between appropriate judicial and legislative investigations would become blurred if the owner of any building containing asbestos could examine any person or entity having anything to do with the entire asbestos industry concerning any communications or conduct related to a family of products containing asbestos. To permit such examination would raise questions of standing, as with federal taxpayer suits disallowed as a general matter in *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). I reject the invitation to permit such examination absent preliminary proof of wrongdoing which would guide into definable channels such an open-ended inquiry. To permit an open-ended inquiry of this nature would initiate an open-ended litigation with no foreseeable limits as to parties, longevity, or what discovery would be authorized. I do not interpret Fed.R.Civ.P. 26 as contemplating such a result on the facts shown here.

## IX

Morgan, Lewis & Bockius, as the defense counsel listed at the top of the service list of defense counsel, is directed to furnish copies of this memorandum order to all other counsel, apart from plaintiffs' counsel.

Since the adoption of Judge Roberts' Report and Recommendation does not dispose of the entire case, and no finding under Fed.R.Civ.P. 54(b) has been made, the clerk

---

8. Historians increasingly often point out the difficulties of unearthing events once recollection of actual participants has faded or they are no longer available. See B. Tuchman, *The First Salute* (1989). Factfinding concerning recent events is itself inherently uncertain in many cases. See *England v. Louisiana Medical Examiners*, 375 U.S. 411, 417, 84 S.Ct. 461, 465–66, 11 L.Ed.2d 440 (1964); *Speiser v. Randall*, 357 U.S. 513, 525, 78 S.Ct. 1332, 1341–42, 2 L.Ed.2d 1460 (1958); Cahn, *Fact Skepticism: An Unexpected Chapter*, 38 N.Y.U.L.Rev. 1025 (1963); Frank, *Courts on Trial* (1963). To permit discovery seeking to impose contemporary legal liability based on long-past events would obviously be appropriate in some cases, but a stronger showing than otherwise is a proper prerequisite.

9. See prevailing and dissenting opinions, *Oneida County v. Oneida Indian Nation*, 470 U.S. 226 and 255–73, 105 S.Ct. 1245 and 1262–72, 84 L.Ed.2d 169 (1985). Injunctive relief to prevent further consequences of long-past misdeeds is sometimes more easily granted in an appropriate case after balancing the equities than are money damages, see *United States v. E.I. DuPont de Nemours & Co. (DuPont–GM)*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), discussed in Markham, *The DuPont–General Motors Decision*, 43 Va.L.Rev. 881 (1957). But such relief is not sought here.

will not enter final judgment at this time nor close this case for administrative purposes.

SO ORDERED.

## APPENDIX A

## REPORT AND RECOMMENDATION

## TO THE HONORABLE VINCENT L. BRODERICK:

These are actions for actual, exemplary and punitive damages based on the existence of asbestos-containing products in buildings owned by plaintiffs, who bring these actions under various theories of liability including negligence; fraud; intentional tort; breach of warranty; market share liability; enterprise liability; concert of action liability; alternative liability; concurrent cause liability; and civil conspiracy. Presently pending before the court is a joint motion for summary judgment by sixteen defendants,[1] as well as the individual motion of defendant W.R. Grace & Co., pursuant to Rule 56 of the Federal Rules of Civil Procedure and paragraph 8 of this Court's Pretrial Order No. 2, dated May 26, 1988. Briefly stated, the moving defendants contend that plaintiffs cannot prove that their buildings contain any asbestos product manufactured, sold or installed by the moving defendants and that in the absence of such proof they are entitled to judgment dismissing the complaints as a matter of law. For the reasons set forth below, I recommend that defendants' motions be granted.

## PRIOR PROCEEDINGS

Plaintiffs commenced these actions in the Supreme Court of the State of New York in July 1987, alleging that the presence of certain asbestos-containing products in buildings in their ownership, custody or control poses a risk to building occupants for which defendants should be held liable. The state court actions named more than 50 defendants which, plaintiffs allege, have engaged, directly or indirectly, in the mining and processing of raw asbestos fiber, or in the manufacturing, sale or installation of asbestos-containing products.

On September 8, 1987, defendant Asbestos Corporation Limited filed a Petition for Removal from the New York State Supreme Court to the United States District Court in the Southern District of New York on the basis of diversity jurisdiction, 28 U.S.C. § 1441(d). The actions against 40 defendants were subsequently removed to this court and assigned to your Honor.

By order dated January 8, 1988, these actions were referred to me to supervise discovery and to prepare a Report and Recommendation on all substantive motions.

## THE PARTIES

There are ten plaintiffs in these actions, all New York corporations or partnerships. Each has at least one building in Manhattan in its ownership, custody or control. The plaintiffs are as follows:

(1) Plaintiff 210 East 86th Street Corporation is the owner of a building located at 210 East 86th Street.

(2) Plaintiff Park Comcar Associates is the owner of a building located at One Park Avenue.

(3) Plaintiff 11 Park Place Associates is the owner of buildings located at 11 Park Place and 25 Park Place.

(4) Plaintiff Broadway West Street Associates is the owner of buildings located at 21 West Street and 71 Broadway.

(5) Plaintiff Hudson Telegraph Associates is owner of a building located at 60 Hudson Street.

(6) Plaintiff Madison 28 Associates is the owner of a building located at 79 Madison Avenue.

1. United States Gypsum Company; Cassiar Mining Corporation, formerly known as Brinco Mining Ltd.; Combustion Engineering, Inc.; ACandS, Inc.; Georgia–Pacific Corporation; Carey Canada Inc.; Lac D'Amiante du Quebec, Ltee.; United States Mineral Products Company; T & N plc, including, and sued herein as its former unit companies, J.W. Roberts, Ltd. and Turner Asbestos Fibres, Ltd.; National Gypsum Company; The Flintkote Company; Asbestos Products Manufacturing Corporation; Asbestospray Corporation; Spraycraft Corporation; Proko Industries, Inc.; and Asbestos Corporation Limited.

(7) Plaintiff Plaza Madison Associates is the owner of a building located at 655 Madison Avenue.

(8) Plaintiff Belmont Madison Associates is the owner of a building located at 183 Madison Avenue.

(9) Plaintiff Gramercy 5 Associates is the owner of a building located at 120 East 23rd Street.

(10) Plaintiff 633 Third Associates is the owner of a building located at 633 Third Avenue.

Plaintiffs have sued the following 40 defendants,[2] all of which are foreign corporations that allegedly conduct or have conducted business in the State of New York:

(1) Combustion Engineering, Inc.*;

(2) W.R. Grace & Co.*;

(3) Certaineed Corporation;[3]

(4) United States Gypsum Company*;

(5) National Gypsum Company*;[4]

(6) United States Mineral Products Company*;

(7) Charles Pfizer & Company, Inc.;[5]

(8) Georgia–Pacific Corporation*;

(9) Proko Industries, Inc.*;

(10) The Flintkote Company*;

(11) C. Tennant & Sons;[6]

(12) Aaer Sprayed Insulations, Inc., a division of Rogers Insulating & Roofing Company, Inc.;[7]

(13) Air–O–Therm Application Co., Inc.;[8]

(14) Wilkins Insulation Company;[9]

(15) Forty–Eight Insulations, Inc.;[10]

(16) Lake Asbestos of Quebec, Ltd.*, also known as Lac D'Amiante Du Quebec, Ltee.;

(17) J.W. Roberts, Ltd.*;

(18) Cape Asbestos;[11]

(19) Asbestos Corporation Limited*;

(20) Carey Canada Inc.*;[12]

(21) Brinco Mining, Ltd.*, formerly known as Cassiar Resources, Ltd.;

(22) Turner Asbestos Fibres, Ltd.*;

(23) Asbestospray Corporation*;

(24) Spraycraft Corporation*, individually and as successor to Asbestospray Corporation and Asbestos Products Manufacturing Corporation;

(25) Asbestos Products Manufacturing Corporation*;

(26) Atlantic Asbestos;[13]

(27) York Insulation;[14]

(28) MBC Corp.,[15] successor to Matthew Ballick;

---

**2.** Of the 40 named defendants in these actions, only 37 have been served with a summons and complaint. I recommend that the actions against the three defendants that have not been served—Aaer Sprayed Insulations, Inc., Asbestos Construction and Richmond Asbestos—be dismissed pursuant to Fed.R.Civ.P. 4(j).

* Moving defendant.

**3.** The action against Certaineed was voluntarily dismissed in the fall of 1991.

**4.** Defendant National Gypsum Company has filed for reorganization under Chapter 11 of the Bankruptcy Code. The litigation against this defendant is therefore stayed pursuant to § 362 of the Bankruptcy Code.

**5.** The action against Pfizer was voluntarily dismissed on April 27, 1989.

**6.** The action against Tennant was voluntarily dismissed on May 18, 1989.

**7.** The pleadings sent to this defendant were returned to plaintiffs by mail, and there has been no appearance in these actions. *See supra* note 2.

**8.** The action against Air–O–Therm was voluntarily dismissed on or about November 4, 1988.

**9.** The action against Wilkins was voluntarily dismissed by stipulation on January 24, 1989.

**10.** Proof of service filed, but no appearance in these actions, and no motion for entry of default.

**11.** *See supra* note 10.

**12.** Carey Canada has filed for reorganization under Chapter 11 of the Bankruptcy Code. The litigation against this defendant is therefore stayed pursuant to § 362 of the Bankruptcy Code.

**13.** *See supra* note 10.

**14.** *See supra* note 10.

**15.** *See supra* note 10.

(29) King Insulation;[16]

(30) Asbestos Construction;[17]

(31) Magnesia Asbestos;[18]

(32) ABCO Insulation;[19]

(33) Insulcoustic;[20]

(34) IMC;[21]

(35) Insulation Materials Corporation;[22]

(36) Richmond Asbestos;[23]

(37) ACandS, Inc.*;

(38) Garlock, Inc.;[24]

(39) Rock Wool Manufacturing Company;[25] and

(40) Standard Asbestos Manufacturing and Insulating Company.[26]

## PRODUCT IDENTIFICATION

At the outset of this litigation, plaintiffs had no evidence to show that the asbestos-containing products in their buildings were manufactured, sold or installed by any of the defendants. Furthermore, plaintiffs had no basis for naming any particular defendant in this action other than plaintiffs' belief that each of the named defendants manufactured, sold or installed asbestos-containing products at the time of the construction or renovation of their buildings. Transcript of pretrial conference held on July 18, 1988, at 5.[27] Accordingly, in Pretrial Order No. 2, the Court established a procedure to determine whether any of defendants in fact manufactured, sold, or installed the asbestos-containing products found in plaintiffs' buildings. The procedure may be summarized as follows:

(1) Plaintiffs were required to produce to defendants a list, on a building-by-building basis, describing in detail the products at issue, including the date each identified product was installed or applied;

(2) Sixty days after the receipt of plaintiffs' list, each defendant was required to serve plaintiffs with lists of the constituents of each of its named products or the described products manufactured by defendants and sold in the United States during the time period included on plaintiffs' list for such products, excluding the percentages of the constituent substances of the products (the "Constituent Lists"). The Constituent Lists did not identify the manufacturer or product name of the product for which a list was submitted;

(3) Simultaneously, defendants filed the Constituent Lists with the court under seal, together with complete product formulas, including constituent substances and percentages of the whole by weight

**16.** *See supra* note 10.

**17.** No proof of service of a summons and complaint has been filed by plaintiffs. *See supra* note 2.

**18.** *See supra* note 10.

**19.** *See supra* note 10.

**20.** *See supra* note 10.

**21.** The action against IMC was voluntarily dismissed on or about August 5, 1987.

**22.** *See supra* note 10.

**23.** No proof of service of a summons and complaint has been filed by plaintiffs. *See supra* note 2.

**24.** The action against Garlock was voluntarily dismissed on January 18, 1989. Garlock is named as a defendant in *Park Comcar Associates, et al. v. Anchor Packing, et al.,* Supreme Court, New York County, Index No. 02442/88, and *210*

*East 86th Street Corp. v. Anchor Packing, et al.,* Supreme Court, New York County, Index No. 02443/88.

**25.** The action against Rock Wool was voluntarily dismissed on August 3, 1992.

**26.** The action against Standard was voluntarily dismissed on January 31, 1989. Standard is named as a defendant in *Park Comcar Associates, et al. v. Anchor Packing, et al.,* Supreme Court, New York County, Index No. 02442/88, and *210 East 86th Street Corp. v. Anchor Packing, et al.,* Supreme Court, New York County, Index No. 02443/88.

**27.** Plaintiffs apparently conducted little, if any, pre-complaint investigation. This is evidenced, *inter alia,* by the dismissal of IMC based upon information provided by IMC that it does not manufacture asbestos-containing materials, but rather, ladies handbags. Letter to the court from plaintiff's counsel, Julien & Schlesinger, P.C., dated April 24, 1992 at 4.

or volume, for each product on the Constituent Lists (the "Product Formulas");

(4) Within 90 days after receipt of the Constituent Lists, plaintiffs were required to complete their expert analysis of bulk samples of each of the products plaintiffs placed in issue, and to disclose the results to defendants and the court, including, with regard to each such bulk sample, both the identity of constituent substances and the percentages of the whole;

(5) Defendants then forwarded copies of the Product Formulas to plaintiffs;

(6) Plaintiffs were then required to notify the court and defendants which, if any, of plaintiffs' samples "matched" a defendant's Product Formula;

(7) If plaintiffs alleged that any of their samples matched a particular formula, plaintiffs were required to provide that defendant with an aliquot at least ½ in volume of the sample taken by plaintiffs to enable that defendant to conduct its own analysis of that sample; and

(8) If the results of plaintiffs' analyses of its samples matched none of a defendant's full product formulas, that defendant was entitled to move for summary judgment.

In addition to the chemical match product identification procedure outlined above, a number of defendants were permitted to move for summary judgment on the grounds that during the relevant time period (1) the defendant did not manufacture or sell the *types* of products at issue in these actions, (2) the defendant mined or processed raw asbestos, or (3) the defendant was a contractor and installer that did not contract with regard to or install any of the products at issue in these actions.

Finally, in a letter from plaintiffs to all defense counsel dated May 23, 1990, plaintiffs agreed to a voluntary dismissal of the action, with prejudice, as to those defendants who could establish by affidavit that their product or materials contained less than one percent (1%) asbestos by weight.[28] Affirmation in Opposition of plaintiffs' counsel, David B. Turret, Esq., dated September 13, 1990 ("Turrett Aff."), Ex. G.

### Types of Products at Issue

Based upon plaintiffs' submissions pursuant to Pretrial Order No. 2, the types of asbestos-containing products at issue in the *210 East 86th Street* action are fireproofing, acoustical ceiling tile and floor tile; the types of asbestos-containing products at issue in the *Park Comcar* action are non-fireproofing and non-sprayed-on thermal and acoustical surface treatment products, and floor tile.

### A. 210 East 86th Street

Plaintiff's initial product list pursuant to Pretrial Order No. 2 identified the products at issue in the *210 East 86th Street* action as sprayed-on asbestos fireproofing and acoustical ceiling tile. *210 East 86th Street* Defendants' Joint Notice of Motion for Summary Judgment, Affidavit of Barry R. Fertel, Esq. ("*210 East* Fertel Aff."), Ex. F (letter from plaintiffs' counsel to all defense counsel dated July 29, 1988).[29] In addition, three of the samples (8, 10 and 16) have been subsequently identified as floor tiles. *210 East* Fertel Aff., Ex. H (July 27, 1989 analyses of bulk samples). Following briefing of defendants' summary judgment motions, plaintiffs' counsel submitted a letter to the court that *for the first time* identified three of the samples (2, 6 and 13) as pipe insulation or pipe covering. Letter to the court from plaintiffs' counsel, Julien & Schlesinger, P.C., dated July 10, 1992. Since plaintiffs failed to list pipe insulation or pipe covering on the *210 East 86th*

---

28. Rock Wool Manufacturing Company was dismissed pursuant to this stipulation.

29. Paragraph 2 of the response for *210 East 86th Street* reads: "*Description and Application of Each Product:* Basement and restaurant level consists of a 7,000 square foot area with sprayed-on asbestos fireproofing on the decking and a 7,000 square foot acoustical tile hung ceiling suspended beneath the decking. Upon information and belief, such condition exists at all levels of the building." Paragraph 4 reads: "*Description of Constituents:* Upon information and belief, the product involved * * * was applied by means of material similar to, or known as nect." *210 East* Fertel Aff., Ex. F.

*Street* Product List as one of the products in issue, and since the analysis of the sixteen bulk samples in the *210 East 86th Street* action did not identify any of the samples as pipe insulation, I find that plaintiffs failed to place pipe insulation or pipe covering at issue in this action. Therefore, Sample Nos. 2, 6 and 13 are not at issue in *210 East 86th Street.*

### B. *Park Comcar*

The products at issue in *Park Comcar* are described in a July 29, 1988 letter to all defense counsel from plaintiffs' counsel. *Park Comcar* Defendants' Joint Notice of Motion for Summary Judgment, Affidavit of Barry R. Fertel, Esq. ("*Park Comcar* Fertel Aff."), Ex. A. These products, which may be described as non-fireproofing and non-sprayed on thermal and acoustical surface treatment products,[30] were found as *inter alia,* pipe insulation; woven asbestos connecting material; air duct insulation; asbestos silicate insulation; boiler insulation; cementitious elbow insulation; cementitious valve insulation; condensate tank insulation; and cementitious joint insulation. *Id.* In addition, plaintiffs attached to the submission for One Park Avenue a list of representative analytical sample results identifying five (5) representative samples as floor tile.[31] *Id.*

### Chemical–Match Product Identification Results

Pursuant to paragraph 4 of Pretrial Order No. 2, plaintiffs retained Electron–Microscopy Service Laboratories, Inc. ("EMSL") to analyze bulk samples of each of the products plaintiffs placed in issue and to determine whether any of those samples could be posi-

tively matched with any of the defendants' Product Formulas. Affidavit of Peter Frasca in Opposition to Defendants' Motions for Summary Judgment, dated September 7, 1990 ("Frasca Aff.") at 4. EMSL and its director, Peter Frasca, analyzed sixteen (16) bulk samples from 210 East 86th Street[32] and forty-six (46) bulk samples from the *Park Comcar* buildings.[33] *Id.* at 4–5. EMSL used a combination of polarized light microscopy ("PLM"), x-ray diffraction ("XRD"), scanning electron microscopy ("SEM"), and analytical transmission electron microscopy ("TEM") to determine the constituent elements of each sample and the percentage of each element in the total sample by weight.[34]

With respect to the sixteen (16) samples from 210 East 86th Street, EMSL's analysis revealed the presence of asbestos in eleven (11) samples (Nos. 1–2, 6, 8–10, and 12–16). *Id.* at 5–6, Ex. A. With respect to the *Park Comcar* buildings, EMSL's analysis revealed the presence of asbestos in all forty-six (46) samples. *Id.* at 6. After completing its analysis of the asbestos-containing samples, EMSL was provided with coded Product Formulas of certain defendants to determine whether any of plaintiffs' samples could be chemically matched with any defendant's product. *Id.* at 6–7.

With respect to the *210 East 86th Street* samples, EMSL initially reached the following conclusions after comparing the defendants' coded Product Formulas with plaintiffs' samples:

1. Possible match of samples # 1, 9, 12, 14, 15 with formulas # 20 (24) and # 21 (25) depending on nature of binders and more exact knowledge of percent compo-

---

**30.** This general description was supplied by defendants. *See, e.g., Park Comcar* Affidavits in Support of Motion for Summary Judgment, Ex. 1 (*Park Comcar* Affidavits of Asbestospray, APMC and Spraycraft, dated June 28, 1990). Plaintiff's counsel confirmed the accuracy of this description at a conference on August 5, 1992.

**31.** Sample Nos. 3126–63, 3126–134, 3126–135, 3126–137 and 3126–144.

**32.** *See* Appendix A.

**33.** *See* Appendix B. Plaintiffs submitted no samples for six (6) of the *Park Comcar* buildings: (1) 11 Park Place; (2) 25 Park Place; (3) 21 West Street; (4) 79 Madison Avenue; (5) 183 Madison Avenue; and (6) 120 East 23rd Street. I therefore recommend that the action be dismissed with respect to these buildings.

**34.** The necessity of using all four types of analysis is explained in the Frasca Affidavit at pp. 5–6, 11–12.

sition of mineral wool and chrysotile asbestos.

2. Possible match of samples # 6 and # 13 with formula # 22 (26) if the binder is cellulose.

*Id.* at 9. In order to reach definitive conclusions with respect to the above-mentioned samples and Product Formulas, EMSL requested that the defendants identify "the binders present in the above formulas as well as the manner * * * in which the percent composition of mineral wool and chrysotile asbestos was determined." *Id.* at 10. After reviewing the additional information submitted by defendants, EMSL determined that none of the defendants' Product Formulas matched any of plaintiffs' samples. *Id.* at 10, Ex. H (letter from Frasca to plaintiffs' counsel dated March 30, 1990).

With respect to the *Park Comcar* samples, EMSL initially asserted that it was unable to make any definitive comparisons because "the constituent components initially submitted by the manufacturers for the purposes of identifying their products were inadequate." *Id.* at 7.[35] Specifically, EMSL asserted that the information provided by the manufacturers: (1) did not provide approximate percentages; (2) did not identify the asbestos type; (3) did not provide components by basic scientific constituents; and (4) provided information that was vague and noncommittal. *Id.* Plaintiffs' counsel therefore requested and received additional information from defendants. *Id.*

Following its analysis of the additional information, EMSL concluded that there were no matches between the Product Formulas and all but two sets of samples.[36] *Id.* at 7–8, Ex. E (letter from Frasca to plaintiffs' counsel dated November 13, 1989). With respect to these two sets of samples, EMSL determined that a possible match with two coded

Product Formulas could not be ruled out "since the nature of the 'binder' in these formulas was not specified." *Id.* at 8.

EMSL was then provided with additional binder information, which EMSL analyzed to determine if there was a possible match with any of the samples. *Id.* As a result of this analysis, EMSL concluded that it was unable to establish a match between the Product Formulas and any of the samples taken from plaintiffs' buildings.[37] *Id.* at 8, Ex. F (letter from Frasca to plaintiffs' counsel dated December 11, 1989).

In sum, after comparing all of the defendants' Constituent Lists and Product Formulas with the results of the analyses of plaintiffs' bulk samples in the *210 East 86th Street* and *Park Comcar* buildings, EMSL concluded that *none* of the defendants' Product Formulas could be matched with any of plaintiffs' samples. Frasca Aff. at 4–13. Based upon the EMSL analyses, plaintiffs' counsel advised defendants by letter dated April 6, 1990, that "having looked at all the samples which were in question [our expert] has determined that they do not match any of the formulas submitted." *210 East* Fertel Aff., Exhibit B.

### DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Seventeen defendants have moved for summary judgment on the ground that there is no chemical match between their products and any of the samples taken from plaintiffs' buildings and/or that they did not manufacture or install the type of products found in plaintiffs' buildings. The moving defendants have submitted affidavits setting forth the following material facts pertaining to product identification, as to which they contend there is no genuine issue:

3126–18; 3126–81; 3126–80; 3126–274NY; 3126–275NY; 3126–017NY. Frasca Aff. at 7–8.

---

**35.** EMSL was unable to determine whether there was a match with respect to three samples (3126–109, 3126–27 and 3126–94) because plaintiffs failed to obtain sufficient sample material to permit XRD analysis. Frasca Aff. at 8, Exs. E, F.

**36.** These two sets of samples included the following sample numbers: 3126–79; 3126–197NY; 3126–181NY; 3126–186NY; 3126–95; 3126–42; 3126–43; 3126–45; 3126–177NY; 3126–176NY;

**37.** EMSL again noted that a match could not be ruled out with respect to three samples from the *Park Comcar* buildings because plaintiffs failed to obtain sufficient sample material. Frasca Aff. at 8, Ex. F.

1. **Defendant Spraycraft Corporation** ("Spraycraft"). Spraycraft did not manufacture or sell any asbestos-containing products. *210 East 86th Street* Defendants' Affidavits in Support of Motion for Summary Judgment ("*210 East* Affidavits"), Ex. 1 (*210 East 86th Street* Affidavit of Asbestospray, APMC and Spraycraft, dated June 28, 1990); *Park Comcar* Defendants' Affidavits in Support of Motion for Summary Judgment ("*Park Comcar* Affidavits"), Ex. 1 (*Park Comcar* Affidavit of Asbestospray, APMC and Spraycraft, dated June 28, 1990). Therefore, Spraycraft did not manufacture or sell any of the asbestos-containing products at issue in either action. *Id.*

2. **Defendant Asbestos Products Manufacturing Corporation ("APMC").**[38] APMC did not manufacture or sell acoustical ceiling tile or floor tile products, which are at issue in the *210 East 86th Street* action. APMC manufactured fireproofing products around the time 210 East 86th Street was constructed, but APMC's product formulas do not match those of the products at issue. *210 East* Affidavits, Ex. 1 (*210 East 86th Street* Affidavit of Asbestospray, APMC and Spraycraft, dated June 28, 1990); Supplemental Affidavit of Asbestospray, APMC and Spraycraft, dated August 18, 1992.

APMC did not manufacture or sell the types of asbestos-containing products at issue in the *Park Comcar* action. *Park Comcar* Affidavits, Ex. 1 (*Park Comcar* Affidavit of Asbestospray, APMC and Spraycraft, dated June 28, 1990); Supplemental Affidavit of Asbestospray, APMC and Spraycraft, dated August 18, 1992.

3. **Defendant Asbestospray Corporation ("Asbestospray").**[39] Asbestospray did not manufacture or sell acoustical ceiling tile or floor tile products, which are at issue in the *210 East 86th Street* action. Asbestospray sold fireproofing products around the time 210 East 86th Street was constructed, but Asbestospray's fireproofing product formulas do not match those of the products at issue. *210 East* Affidavits, Ex. 1 (*210 East 86th*

*Street* Affidavit of Asbestospray, APMC and Spraycraft, dated June 28, 1990); Supplemental Affidavit of Asbestospray, APMC and Spraycraft, dated August 18, 1992.

Asbestospray did not manufacture or sell the kind of asbestos-containing products at issue in the *Park Comcar* action. *Park Comcar* Affidavits, Ex. 1 (*Park Comcar* Affidavit of Asbestospray, APMC and Spraycraft, dated June 28, 1990); Supplemental Affidavit of Asbestospray, APMC and Spraycraft, dated August 18, 1992.

4. **Defendant ACandS, Inc.** ("ACandS"). ACandS has been a contracting company primarily engaged in the installation of thermal insulation materials. During the period from January 1, 1958, when ACandS began operations, through approximately 1973, the company utilized and provided thermal insulation materials containing asbestos when called for by contract requirements or specifications. Although these materials were manufactured by others, ACandS occasionally sold them in connection with its contracting business. However, ACandS has no record of any contracts performed at any of plaintiffs' buildings. In addition, it has not located among its existing records any documents identifying the sale of asbestos-containing products by ACandS for any of plaintiffs' buildings. *210 East* Affidavits, Ex. 2 (*210 East 86th Street* Affidavit of ACandS, dated June 29, 1990); *Park Comcar* Affidavits, Ex. 2 (*Park Comcar* Affidavit of ACandS, dated June 29, 1990).

5. **Defendant Carey Canada Inc. ("Carey Canada").** Carey Canada has filed for reorganization under Chapter 11 of the Bankruptcy Code. The litigation against this defendant is therefore stayed pursuant to § 362 of the Bankruptcy Code.

6. **Defendant Cassiar Mining Corporation, formerly Brinco Mining Ltd. ("Cassiar").** Cassiar has mined and sold raw chrysotile asbestos fiber in a variety of grades. It mined asbestos at Cassiar, British Columbia since 1953, and at Clinton Creek, Yukon Territory from 1968 until 1978. It does not manufacture or sell any finished asbestos-

---

**38.** A detailed summary of APMC's supporting affidavits is set forth in Appendix C.

**39.** A detailed summary of Asbestospray's supporting affidavits is set forth in Appendix D.

containing products, nor has it ever assumed the assets and/or liabilities of any predecessor corporation or entity associated in any way with asbestos fiber or products. *210 East* Affidavits, Ex. 4 (*210 East 86th Street* Affidavit of Cassiar, dated June 15, 1990); *Park Comcar* Affidavits, Ex. 4 (*Park Comcar* Affidavit of Cassiar, dated June 15, 1990).

**7. Defendant Combustion Engineering, Inc. ("Combustion Engineering").[40]** Combustion Engineering has never made asbestos-containing ceiling tile or floor tile, which are at issue in the *210 East 86th Street* action. *210 East* Affidavits, Ex. 5 (*210 East 86th Street* Affidavit of Combustion Engineering, dated June 28, 1990); Second Supplemental Affidavit of Combustion Engineering, dated August 27, 1992. The only asbestos-containing product made and sold by Combustion Engineering that could be considered to be a fireproofing product was Pyroscat. *210 East 86th Street* Affidavit of Combustion Engineering, dated June 28, 1990. However, Pyroscat had only industrial and refinery applications and was not used in commercial buildings. *Id.* In addition, Combustion Engineering has submitted an affidavit stating that Pyroscat is composed of different components than plaintiff's samples. *Id.*

Combustion Engineering commenced the manufacture and sale of asbestos-containing insulation materials in 1963, and continued to manufacture and sell such products until 1972. Thus, the only products that can be at issue in this action with respect to Combustion Engineering are those asbestos-containing insulation materials installed between 1963 and 1972. Supplemental Affidavit of Combustion Engineering, dated November 11, 1991.

Based on the dates of construction and renovation of the *Park Comcar* buildings,[41] Combustion Engineering's products are not at issue, except with respect to the products used in a 1969 boiler room renovation at 60

Hudson Street. *Park Comcar* Affidavits, Ex. 5 (*Park Comcar* Affidavit of Combustion Engineering, dated June 28, 1990); Supplemental Affidavit of Combustion Engineering, dated November 11, 1991; Second Supplemental Affidavit of Combustion Engineering, dated August 27, 1992. With respect to the samples taken from 60 Hudson, Combustion Engineering did not manufacture pipe insulation products or gasket or gasketing material products; therefore only three samples (60–060, 60–012 and 60–015) are at issue. Supplemental Affidavit of Combustion Engineering, dated November 11, 1991. In addition, one of plaintiff's samples, No. 60–060 contains less than 1% asbestos and thus, is not at issue. *Id.* The two remaining samples, 60–012 and 60–015, do not match any of this defendant's product formulas. *Id.*

**8. Defendant The Flintkote Company ("Flintkote").[42]** Flintkote did not manufacture or sell asbestos-containing fireproofing or ceiling tiles, which are at issue in the *210 East 86th Street* action, for commercial or industrial applications. *210 East* Affidavits, Ex. 6 (*210 East 86th Street* Affidavit of Flintkote, dated June 16, 1990). Although Flintkote does manufacture asbestos-containing floor tile products, which are at issue in the *210 East 86th Street* action, none of plaintiff's floor tile samples are Flintkote's product. *210 East 86th Street* Supplemental Affidavit of Flintkote, dated August 7, 1992.

Flintkote did not manufacture, distribute or sell any asbestos-containing cloth lagging for wrapping pipes or other types of pipe and boiler insulation at issue in the *Park Comcar* action. *Park Comcar* Affidavits, Ex. 6 (*Park Comcar* Affidavit of Flintkote, dated June 16, 1990). The only product Flintkote manufactured that was identified in plaintiffs' *Park Comcar* samples, is asbestos-containing floor tile. However, none of plaintiffs' samples match any of Flintkote's products. *Id.; Park Comcar* Supplemental Affidavit of Flintkote, dated August 7, 1992.

**9. Defendant Georgia–Pacific Corporation ("Georgia Pacific").** Georgia Pacific

---

**40.** A detailed summary of Combustion Engineering's supporting affidavits is set forth in Appendix E.

**41.** *See* Appendix K.

**42.** A detailed summary of Flintkote's supporting affidavits is set forth in Appendix F.

does not and has never made asbestos-containing ceiling tile, floor tile, or fireproofing products, which are at issue in the *210 East 86th Street* action; nor has it ever made asbestos-containing insulation products, woven asbestos connecting material, asbestos-containing firedoors or ceiling or floor tile products, which are at issue in the *Park Comcar* action. *210 East* Affidavits, Ex. 7 (*210 East 86th Street* Affidavit of Georgia Pacific, dated June 19, 1990); *Park Comcar* Affidavits, Ex. 7 (*Park Comcar* Affidavit of Georgia Pacific, dated June 19, 1990); *210 East 86th Street* and *Park Comcar* Supplemental Affidavits of Georgia Pacific, dated August 19, 1992.

10. **Defendant Lac d'Amiante du Quebec, Ltee. ("LAQ").** LAQ has always operated exclusively as a miner and miller of raw chrysotile asbestos fiber, and did not begin to sell raw asbestos fiber in commercial quantities until July 1958. LAQ has never mined, milled or sold amosite or crocidolite asbestos fiber. *210 East* Affidavits, Ex. 8 (*210 East 86th Street* Affidavit of LAQ, dated June 19, 1990); *Park Comcar* Affidavits, Ex. 8 (*Park Comcar* Affidavit of LAQ, dated June 19, 1990). LAQ mined and milled raw asbestos at its facilities in the Province of Quebec, Canada, and sold its raw asbestos fiber F.O.B. the Province of Quebec, Canada. *Id.*

LAQ never manufactured, sold or distributed any asbestos-containing products, including fireproofing, acoustical ceiling tile, non-fireproofing or non-acoustical plaster products, nor has LAQ ever been a successor-in-interest of any such manufacturer or distributor. *Id.* Moreover, LAQ never sold or delivered any raw asbestos fiber to construction sites located anywhere in the United States. As a raw material supplier, LAQ had no control over the manufacturing, packaging, labelling, testing, marketing, or selling of the asbestos-containing products manufactured by its customers. At the point of sale, LAQ never knew the identities or location of the distributors or ultimate purchasers of any manufactured asbestos-containing products that might have contained asbestos fiber mined by LAQ. *Id.*

11. **Defendant National Gypsum Company ("Gold Bond").** National Gypsum Company has filed for reorganization under Chapter 11 of the Bankruptcy Code. The litigation against this defendant is therefore stayed pursuant to § 362 of the Bankruptcy Code.

12. **Defendants T & N plc, J.W. Roberts, Ltd. and Turner Asbestos Fibres, Ltd. ("T & N").**[43] T & N did not manufacture acoustical ceiling or floor tile products, which are at issue in the *210 East 86th Street* action; the only asbestos-containing building product ever made and sold by T & N in the United States was a fireproofing product called Sprayed Limpet Asbestos ("Limpet"), a product of T & N's United Kingdom subsidiary, J.W. Roberts, Limited. *210 East* Affidavits, Ex. 10 (*210 East 86th Street* Affidavit of T & N, dated July 11, 1990); *Park Comcar* Affidavits, Ex. 10 (*Park Comcar* Affidavit of T & N, dated July 11, 1990).[44] However, Limpet does not match the *210 East 86th Street* samples. *210 East 86th Street* Affidavit of T & N, dated July 11, 1990; letter to the court from T & N's counsel, Haythe & Curley, dated August 17, 1992.

T & N did not export for sale in the United States the types of asbestos-containing products at issue in the *Park Comcar* action. *Park Comcar* Affidavit of T & N, dated July 11, 1990.

13. **Defendant United States Gypsum Company ("U.S. Gypsum").**[45] U.S. Gypsum made and sold fireproofing and acoustical ceiling tile products, which are at issue in the *210 East 86th Street* action; however, none of plaintiffs' samples match U.S. Gypsum's products. *210 East* Affidavits, Ex. 11 (*210 East 86th Street* Affidavit of U.S. Gypsum, dated June 19, 1990); *210 East 86th Street* Supplemental Affidavit of U.S. Gypsum, dat-

**43.** A detailed summary of T & N's supporting affidavits is set forth in Appendix G.

**44.** Exhibit 10 is an unsigned affidavit filed on July 3, 1990. A signed affidavit, dated July 11, 1990, was later filed with the court.

**45.** A detailed summary of U.S. Gypsum's supporting affidavits is set forth in Appendix H.

ed October 11, 1991. U.S. Gypsum did not manufacture vinyl asbestos floor tile, which is also at issue in *210 East 86th Street.* Second Supplemental Affidavit of U.S. Gypsum, dated August 24, 1992.

Between 1936 and 1939, U.S. Gypsum manufactured very limited quantities of asbestos paper, felt and cement used in pipe coverings, all of which are at issue in the *Park Comcar* action. *Park Comcar* Affidavits, Ex. 11 (*Park Comcar* Affidavit of U.S. Gypsum, dated June 19, 1990); *Park Comcar* Supplemental Affidavit of U.S. Gypsum, dated October 11, 1991. However, since none of the buildings in the *Park Comcar* action were constructed or renovated during the three-year period in which U.S. Gypsum manufactured asbestos-containing pipe covering products, the pipe covering products at issue in *Park Comcar* could not possibly have been manufactured by U.S. Gypsum. *Id.* As noted above, U.S. Gypsum did not manufacture vinyl asbestos floor tile, which is also at issue in *Park Comcar.* Second Supplemental Affidavit of U.S. Gypsum, dated August 24, 1992.

**14. Defendant United States Mineral Products Company ("USMPC").**[46] This defendant first started making products containing asbestos in 1954. It discontinued the manufacture of such products in 1972, and since then its products have been asbestos-free. During the relevant time periods USMPC manufactured sprayed on asbestos-containing products, which are at issue in the *210 East 86th Street* action. However, none of the plaintiffs' samples match USMPC's products. *210 East* Affidavits, Ex. 12 (*210 East 86th Street* Affidavit of USMPC, dated June 28, 1990); *210 East 86th Street* Supplemental Affidavit of USMPC, dated October 17, 1991. USMPC did not manufacture asbestos-containing floor tile, which is also at issue in *210 East 86th Street. Id.*

USMPC manufactured Cominco cement, which is at issue in *Park Comcar.* However, none of USMPC's products match any of the samples submitted by plaintiffs. *Park Com-car* Affidavits, Ex. 12 (*Park Comcar* Affidavit of USMPC, dated June 28, 1990); *Park Comcar* Supplemental Affidavit of USMPC, dated October 17, 1991. As noted above, USMPC does not manufacture floor tile. *210 East 86th Street* Supplemental Affidavit of USMPC, dated October 17, 1991.

**15. Defendant W.R. Grace & Co. ("Grace").** The only asbestos-containing building products made and sold by Grace were fireproofing and acoustical plaster products. Local Civil Rule 3(g) Statement of W.R. Grace; Affidavit of John R. Vaughan, dated July 3, 1990; Affidavits of Julie Chi-Sun Yang, dated June 20, 1990. Grace did not make the products at issue in *210 East 86th Street* because none of plaintiff's samples match Grace's products. *210 East 86th Street* Affidavit of Julie Chi-Sun Yang, dated June 20, 1990. W.R. Grace did not make or sell any of the types of products at issue in *Park Comcar.*[47] *Park Comcar* Affidavit of Julie Chi-Sun Yang, dated June 20, 1990.

**16. Defendant Proko Industries, Inc. ("Proko").** Proko has never manufactured or sold any sprayed-on asbestos fireproofing products, acoustical ceiling tile or floor tile products, the products at issue in the *210 East 86th Street* action. *210 East 86th Street* Affidavit of Proko, dated July 6, 1990; *210 East 86th Street* Supplemental Affidavit of Proko, dated August 6, 1992. It also has never manufactured or sold non-fireproofing and non-sprayed thermal and acoustical surface treatment or floor tile products, which are at issue in the *Park Comcar* action. *Park Comcar* Affidavit of Proko, dated July 6, 1990; *Park Comcar* Supplemental Affidavit of Proko, dated August 6, 1992. Therefore, none of the products at issue were manufactured or sold by this defendant.

**17. Defendant Asbestos Corporation Limited ("ACL").** ACL mines and mills raw asbestos fibers, and sells such fibers F.O.B. in Quebec, Canada to knowledgeable, sophisticated purchasers. Declaration of ACL, dated August 28, 1992. ACL did not and does not sell in New York. *Id.* ACL also did not and does not sell asbestos-con-

---

**46.** A detailed summary of USMPC's supporting affidavits is set forth in Appendix I.

**47.** A detailed summary of Grace's supporting affidavits is set forth in Appendix J.

taining products. *Id.* Moreover, ACL has not been identified as a supplier to any of plaintiffs' buildings. *Id.* Therefore, none of the products at issue were manufactured, sold or supplied by this defendant.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS

In opposition to defendants' motions plaintiffs submitted a Memorandum of Law ("Pl. Memo"), the affidavit of plaintiffs' counsel, David B. Turret, Esq. ("Turret Aff."), the affidavit of Peter Frasca ("Frasca Aff."), and a statement pursuant to Local Rule 3(g) ("Pl. 3(g)").

Plaintiffs acknowledged that "they are unable, at this stage of the litigation, to positively identify the manufacturers of the asbestos-containing materials which have caused the damages sought to be recovered in these lawsuits." Pl. Memo at 2. Plaintiffs contend, however, that this failure should not result in the dismissal of these actions for two reasons.

First, plaintiffs assert that "the fact that by scientific analysis [Frasca] and his company were unable to positively match any of the samples with the defendants' formulas submitted does not establish that defendants' asbestos-containing materials are not within the subject buildings and/or are not in the samples analyzed." Pl. Memo at 2–3 (Frasca Aff. at 12). Plaintiffs further assert that "defendants' responsibility and role in the distribution to and installation of asbestos-containing materials in the subject buildings * * * may be established through invoices, bills of lading, shipment tickets and documents, which are within the exclusive control of the defendants and have yet to be reviewed by the plaintiffs in this pre-answer stage of the litigation." Pl. Memo at 3. Plaintiffs note that "Federal Rule of Civil Procedure 56(f) specifically contemplates the denial of summary judgment to permit discovery." Pl. Memo at 3–4.

Second, plaintiffs contend that even if defendants' products are not in their buildings,

they are entitled to recover against those defendants "who were active and substantial participants in the asbestos industry" based upon "alternative theories of liability," *i.e.,* "concert of action, joint enterprise [and] market share." Pl. Memo at 4.

### DISCUSSION

#### I. *Product Identification*

I turn first to the question of whether the moving defendants are entitled to summary judgment with respect to plaintiffs' traditional product liability claims on the ground that plaintiffs cannot prove that defendants' products are in their buildings.

Although plaintiffs concede that they are unable to establish a chemical match between any of their samples and defendants' Product Formulas,[48] plaintiffs seek to avoid summary judgment and obtain further discovery on the basis of Frasca's contention that defendants' products may be in plaintiffs' buildings notwithstanding the absence of a "definitive" match. Frasca Aff. at 12–13. Specifically, plaintiffs' expert states that:

> While we were able to determine that there were certain elements common to the samples and the formulas such as Chrysotile and/or binders, there was no exact match when comparing the percentages that were calculated to be present in the samples with the percentages listed by the manufacturers. Several of the bulk samples that we analyzed contained certain cementicious products, such as cement or other types of calcium or silicon binders, which could have been mixed in during application to the buildings with the products that had been obtained from the manufacturers many years ago.
>
> It is possible that we were unable to make a definitive determination as to whether any of the samples obtained from the buildings match any of the formulas provided by the defendants, since such samples were applied to the buildings many years ago and in the course of application some of the samples could have been mixed in with other substances, which thereby changed the percentages of

---

48. *See supra* pp. 13–17.

elements of the substances in the manufacturers' products.

Based upon the diligent efforts of my company, I can conclude, with reasonable certainty, that an analysis and/or comparison of any samples removed from the subject buildings with the manufacturers' formulas cannot lead to any definitive identification of which manufacturer is responsible for the asbestos-containing materials in the buildings which are the subject of these lawsuits. I can also conclude that the aforementioned opinion does not necessarily mean, imply or suggest that the products of the manufacturers who provided formulas are not in the subject buildings and are not in the samples analyzed.

Frasca Aff. at 12–13.

## A. The Applicable Summary Judgment Standard.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a summary judgment motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(e) provides, *inter alia,*

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the defendant, an asbestos manufacturer, moved for summary judgment because the plaintiff was unable to produce any evidence that her deceased husband had been exposed to defendant's products. The Court held that the plain language of Rule 56(c) "mandates the entry of summary judgment * * * against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. The Court granted summary judgment for the defendant, holding that there could be no genuine issue of material fact because plaintiff's complete failure of proof concerning product identification (an essential element of plaintiff's case) necessarily rendered all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

## B. The Applicable Product Liability Standard.

Under New York law, a plaintiff has the burden of proving that the product at issue is that of the defendant. *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 945, 539 N.E.2d 1069 *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989) ("In a products liability action, identification of the exact defendant whose product injured the plaintiff is, of course, generally required."); *Morrissey v. Conservative Gas Corp.,* 285 A.D. 825, 136 N.Y.S.2d 844 (2d Dep't 1955), *aff'd sub nom.; People v. DiStefano,* 1 N.Y.2d 739, 152 N.Y.S.2d 288, 135 N.E.2d 45 (1956); *see also Johnson v. Celotex Corp.,* 899 F.2d 1281, 1285–86 (2d Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990); *Bauer v. Raymark Industries, Inc.,* 849 F.2d 790, 792–93 (2d Cir. 1988) (both cases holding that as a threshold matter, under New York law, a plaintiff must establish that the asbestos-containing product at issue is that of the defendant and that the injury involved was proximately caused by such product).

As in *Celotex,* the moving defendants in these cases claim that plaintiffs have failed to establish that the asbestos-containing products in their buildings were manufactured by the defendants. Accordingly, defendants contend, there can be no genuine issue of material fact because plaintiffs have failed to prove an essential element of their claims. Defendants also point out that, unlike *Celotex,* the defendants in these actions have

submitted affidavits negating plaintiffs' claim. *See Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552. Therefore, defendants argue that they have an even stronger case for summary judgment against plaintiffs.[49]

Plaintiffs do not deny that they have been unsuccessful in identifying any of the defendants' products as being the products at issue. In fact, plaintiffs concede that none of the defendants' Product Formulas matched any of plaintiffs' samples.[50] Moreover, plaintiffs do not argue that summary judgment should be denied due to the existence of a genuine issue of fact regarding product identification, based on Frasca's assertion that his analysis does not "rule out" the presence of certain defendants' products. Instead, plaintiffs contend that summary judgment should be denied because they have not had adequate time for discovery.

## C. The Sufficiency of Discovery.

Plaintiffs assert that "[n]o defendant is entitled to summary judgment at the prediscovery stage of the litigation" and that plaintiffs are "entitled to establish product identification by circumstantial evidence, which is exclusively within the control of the defendants (*i.e.*, invoices, bills of lading, shipment tickets, and other documents)," Pl. 3(g) ¶¶ 5–6, and which "could confirm the presence [in their buildings] of products manufactured, distributed, mined or installed by the defendants." Pl. Memo at 8. Plaintiffs assert that the only discovery produced by defendants thus far consists of the coded Product Formulas belonging to "some unidentified defendant-manufacturers," and that "nothing has been provided by miners, installers, exporters or importers." *Id.* Plaintiffs assert that "[a]t the very least, [they] are entitled to obtain * * * invoices, contract documents, bills of lading, routing slips, etc. * * * which

could lead to information which would enable plaintiffs to defeat summary judgment." *Id.*

Plaintiffs point out that in *Celotex* the Supreme Court specifically noted that:

[t]he parties had conducted discovery, and no serious claim can be made that [plaintiff] was in any sense "railroaded" by a premature motion for summary judgment. Any potential problem with such premature motions can be adequately dealt with under rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery.

*Celotex Corp. v. Catrett*, 477 U.S. at 326, 106 S.Ct. at 2554; Pl. Memo at 9.

Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

I note at the outset that plaintiffs have failed to comply with the procedural requirements of Rule 56(f). Rule 56(f) requires the party opposing summary judgment who claims to be unable to produce evidence in opposition to the motion "to file an affidavit describing the nature of the requested discovery, its relevance to genuine issues of material fact, what efforts the affiant has made to obtain the discovery and why those efforts were unsuccessful." *Belfiore v. New York Times Co.*, 826 F.2d 177, 184 (2d Cir. 1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988); *Burlington Coat Factory Warehouse Corp. v. Esprit De*

---

49. The miners of raw asbestos are also entitled to summary judgment because suppliers of ingredients or raw materials cannot be held liable for damages allegedly caused by exposure to an end product into which that ingredient or raw material has been incorporated. *See* Def. Memo at 12 n.*.

50. *See supra* pp. 13–17. Plaintiffs' 3(g) statement states "[i]f the identity and precise quantity of each and every constituent element as well as any binders were known, it may be possible to compare the samples with the manufacturers' formulas to arrive [at] an exact match." Pl. 3(g) ¶ 2. I note, however, that the defendants have provided all information requested by plaintiffs' expert.

*Corp.*, 769 F.2d 919, 926 (2d Cir.1985). Although plaintiffs have mentioned certain items of discovery in their legal memorandum in opposition to the defendants' motions, they have filed no Rule 56(f) affidavit. It is well-established that the failure to file a Rule 56(f) affidavit is by itself a sufficient basis to reject a claim that the opportunity for discovery was inadequate, and that "[a] memorandum is not a substitute for an affidavit under Rule 56(f)." *Burlington Coat Factory*, 769 F.2d at 926. Plaintiffs' claim that they have been denied adequate discovery should therefore be rejected because of their failure to submit a Rule 56(f) affidavit.

Plaintiffs' claim of inadequate discovery is in any event meritless. In this circuit, summary judgment may not be granted where the party opposing the motion has been denied "reasonable access to potentially favorable information." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). However, "plaintiffs must identify specific issues of material fact which are *likely* to be disclosed if they are granted a reasonable opportunity to pursue the additional discovery they seek." *Contemporary Mission, Inc. v. New York Times Co.*, 665 F.Supp. 248, 269 (S.D.N.Y.1987), *aff'd*, 842 F.2d 612 (2d Cir.), *cert. denied*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988) (emphasis added); *see also Netto v. Amtrak*, 863 F.2d 1210, 1216 (5th Cir.1989) (plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment "is not unlimited and may be cutoff when the record shows that the requested discovery will not be likely to produce facts he needs to withstand a summary judgment motion"). "A 'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 107 (2d Cir. 1981); *see also Isaacs v. Mid America Body & Equip. Co.*, 720 F.Supp. 255, 257 (E.D.N.Y. 1989) (quoting *Keebler Co. v. Murray Bakery Products*, 866 F.2d 1386, 1389 (Fed.Cir.1989)) ("[I]f all one had to do to obtain a grant of a Rule 56(f) motion were to allege possession by movant of 'certain information' and 'other evidence,' every summary judgment decision would have to be delayed while the non-movant goes fishing in the movant's files."); *Sundsvallsbanken v. Fondmetal, Inc.*, 624 F.Supp. 811, 815 (S.D.N.Y.1985) ("Rule 56(f) is not a shield against all summary judgment motions. Litigants * * * must show that the material sought is germane * * * and that it is neither cumulative nor speculative"). Moreover, Rule 56(f) may not be used as means for prolonging an action when further discovery is based on mere speculation. *Contemporary Mission Inc. v. New York Times Co.*, 665 F.Supp. at 269 ("Rule 56(f) is not a license for a fishing expedition"). Finally, the district court has "discretion to prevent 'the plaintiff from burdening the defendants with a needless round of discovery.'" *Paul Kadair, Inc. v. Sony Corp. of America*, 694 F.2d 1017, 1030 (5th Cir.1983) (quoting *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d at 105).

In light of the results of the chemical analyses performed by plaintiffs' own expert, I find that plaintiffs' request for additional discovery is wholly speculative and not "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Indeed, it is clear that there is no *genuine* dispute regarding the presence of defendants' products in plaintiffs' buildings.

It should be noted that a number of defendants submitted affidavits representing that they did not manufacture the *type* of product found in plaintiffs' buildings. Plaintiffs have not cited any reason to question the truth of these representations. In the absence of *any* evidence to the contrary, subjection of these defendants to the burdensome discovery suggested by plaintiffs is manifestly unreasonable.

In addition, I note that virtually all of the defendants that manufactured the types of products found in plaintiffs' buildings submitted affidavits representing that plaintiffs' samples were missing a constituent element of their product formula. Accordingly, the absence of a match cannot be explained by the mixing in of other substances with plaintiffs' samples, which would result in the presence of *additional* ingredients. *See* Frasca

Aff. at 12–13. Finally, although Frasca asserts in a supplemental affidavit that it is "impossible to rule out products whose formula may contain a component completely missing from the samples", *see* Supplemental Affidavit dated October 14, 1991, at 4–5, his failure to address specific formulas and samples renders his assertion pure speculation.

## II. *"Alternative" Legal Theories*

Plaintiffs argue that summary judgment should be denied because there are alternative theories of liability that do not require product identification and which permit the imposition of liability on a "collective basis." Pl. Memo at 13. Specifically, plaintiffs contend that they are entitled to recover against defendants who were active and substantial participants in the asbestos industry under the following theories: (1) market share liability; (2) concert of action liability; (3) enterprise liability; (4) alternative liability; (5) concurrent cause liability; and (6) civil conspiracy. Pl. Memo at 15; *see also* letter to all defense counsel from plaintiffs' counsel, Julien & Schlesinger, P.C., dated March 15, 1989. It is undisputed that the availability of these alternative theories is governed by New York law.

## A. Market Share Liability

In *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 944, 539 N.E.2d 1069, 1071–72 *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989), the New York Court of Appeals adopted the market share theory "for determining liability and apportioning damages in DES cases in which identification of the manufacturer of the drug that injured the plaintiff is impossible." As formulated by the Court of Appeals, market share liability in DES cases imposes several (but not joint) liability for damages upon DES producers in proportion to their share of the national market of DES sold for pregnancy use. *Id.* 541 N.Y.S.2d at 950, 539 N.E.2d at 1077–78. The Court of Appeals expressly limited the applicability of the market share theory to the unique circumstances of DES cases:

> We stress, however, that the DES situation is a singular case, with manufacturers acting in a parallel manner to produce an identical, generically marketed product, which causes injury many years later, and which has evoked a legislative response reviving previously barred actions. Given this unusual scenario, it is more appropriate that the loss be borne by those that produced the drug for use during pregnancy, rather than by those who were injured by the use, even where the precise manufacturer of the drug cannot be identified in a particular action.

*Id.* at 947.

Plaintiff does not dispute that the extension of the market share theory to asbestos-in-buildings cases has been rejected by every court to consider the issue. *See, e.g., Mullen v. Armstrong World Industries, Inc.,* 200 Cal.App.3d 250, 246 Cal.Rptr. 32 (1988); *Board of Education v. Celotex Corp.,* No. 84–429634NP (Mich.Circ.Ct. Feb. 1, 1988). In rejecting the application of the market share theory, the Court in *Mullen* noted that asbestos is a fundamentally different product from DES:

> One of the predicates for [market share] liability is the absence of discernible distinguishing features or characteristics of the instrumentalities produced by the industry defendants. The court [in *Sindell v. Abbott Laboratories,* [26 Cal.3d 588, 163 Cal. Rptr. 132] 607 P.2d 924 (1980), which established market share theory] took pains to establish that it was dealing with "fungible goods"—specifically, a drug produced "from an identical formula." * * * Plaintiffs' argument that market share liability should be extended from the DES field of *Sindell* to the asbestos industry proceeds on the premise that DES and asbestos are simple equivalents. This is far from being the case.

*Mullen,* 246 Cal.Rptr. at 35–36.

Moreover, courts considering the market share theory in asbestos personal injury actions, where product identification is generally more difficult than in asbestos-in-building cases, have also rejected its application. *See Bateman v. Johns–Manville Sales Corp.,* 781 F.2d 1132 (5th Cir.1986) (it is for the state to decide for itself whether to make the major policy change of adopting market share theo-

ry); *Marshall v. Celotex Corp.*, 651 F.Supp. 389, 393 (E.D.Mich.1987) ("Market share liability was developed for a fungible product, the drug DES."); *Vigiolto v. Johns–Manville Corp.*, 643 F.Supp. 1454, 1463 (W.D.Pa.1986), *aff'd*, 826 F.2d 1058 (3d Cir.1987) ("DES was produced by hundreds of companies pursuant to one formula. As a result, all DES had identical physical properties and chemical compositions * * * asbestos products, on the other hand, have widely divergent toxicities, with some asbestos products creating a much greater risk of harm than others."); *Hannon v. Waterman S.S. Corp.*, 567 F.Supp. 90, 92 (E.D.La.1983) ("Put simply, an asbestosis case is not a DES case, for asbestos is not like DES * * *."); *In re Related Asbestos Cases*, 543 F.Supp. 1152, 1158 (N.D.Cal.1982) ("[U]nlike DES, which is a fungible commodity, asbestos fibers are of several varieties, each used in varying quantities by defendants in their products, and each differing in its harmful effects."); *Celotex v. Copeland*, 471 So.2d 533, 537 (Fla.1985), *rev'g* 447 So.2d 908 (Fla.Dist.Ct.App.1984) ("[T]here are inherent differences between asbestos products and the drug DES, for which the market share theory was developed, which further make the market share theory extremely difficult to apply in asbestos-related cases."); *Goldman v. Johns–Manville Sales Corp.*, 33 Ohio St.3d 40, 514 N.E.2d 691, 700 (1987) ("[T]he significant factual differences between the DES cases and asbestos litigation make market-share liability inappropriate to this case. The foremost difficulty is the concept of *fungibility*."); *Case v. Fibreboard Corp.*, 743 P.2d 1062, 1065 (Okla.1987) ("It is of major importance that *Sindell* was decided in the context of a product that was truly fungible."); *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 71 (Tex.1989) ("[T]he practical impossibility of determining where or when the product was marketed makes insurmountable the problem of identifying the defendants' relevant market shares. We conclude that no variation of market share liability could be applied rationally and fairly on the facts of this case.").

Plaintiffs rely upon *Hardy v. Johns–Manville Sales Corp.*, 509 F.Supp. 1353 (E.D.Tex. 1981), *rev'd on other grounds*, 681 F.2d 334 (5th Cir.1982). Pl. Memo at 22–25. However, the opinion in that case was vacated in a September 24, 1982 order stating that "[t]he 'market share' theory departs from traditional tort theories of recovery in Texas to an extent that the prospect of its being approved by the Fifth Circuit is not great enough to justify the expense to the litigants and the time that of necessity would be involved by the Court." *Hardy v. Johns–Manville Sales Corp.*, 509 F.Supp. 1353 slip op. (E.D.Tex. Sept. 24, 1982).[51] Consequently, *Hardy* provides no support for plaintiffs' contention that market share liability applies in asbestos cases.

Courts have also held that the application of market share theory to asbestos is impracticable because of the difficulties of defining a relevant market for a product with such a wide variety of uses, forms and chemical compositions. *See In re Related Asbestos Cases*, 543 F.Supp. at 1158 ("[D]efining the relevant product and geographic markets would be an extremely complex task due to the numerous uses to which asbestos is put * * *."); *Leng v. Celotex Corp.*, 196 Ill. App.3d 647, 143 Ill.Dec. 533, 536, 554 N.E.2d 468, 471 (1st Dist.1990) ("[T]he problem of how to apportion liability and define the relevant product and geographic markets would be extraordinarily complex and not feasible.").

Furthermore, in order to succeed on this theory, a plaintiff must join a "substantial share" of the manufacturers of the relevant market. *Sindell*, 607 P.2d at 937. However, although plaintiffs claim that they have sued the "majority of manufacturers responsible for marketing asbestos-containing materials for use in buildings," they have not established that this constitutes a "substantial share" of the relevant market. Pl. Memo at 47.

Finally under market share theory, the burden of proving causation shifts to the manufacturer, which may exculpate itself by demonstrating that it did not produce the injury causing product. Here, defendants

---

**51.** A copy of this order is annexed to defendants' reply memorandum.

have already demonstrated that they did not produce the products at issue in these actions.[52] Accordingly, even if this theory were available to plaintiffs, they could not recover against the defendants in this case.

## B. Concert of Action Liability

Plaintiffs have also asked this Court to consider concert of action liability. Pl. Memo at 26–39. This theory, "seen in drag racing cases, provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in a 'common plan or design to commit a tortious act'." *Hymowitz*, 541 N.Y.S.2d at 946, 539 N.E.2d at 1073 (quoting *W. Page Keeton, et al.,* Prosser and Keeton on the Law of Torts § 46, at 323 (5th ed. 1984)). Under this theory, it is essential that "each defendant charged with acting in concert have acted tortiously and that one of the defendants committed an act in pursuance of the agreement which constitutes a tort." *Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d 289, 582 N.Y.S.2d 373, 375, 591 N.E.2d 222, 224 (1992) (citing Prosser & Keeton, *supra,* at 324). Moreover, parallel activity among companies developing and marketing the same product, without more, "is insufficient to establish the agreement element necessary to maintain a concerted action claim." *Rastelli,* 582 N.Y.S.2d at 375, 591 N.E.2d at 224 (quoting *Hymowitz,* 541 N.Y.S.2d at 946–47, 539 N.E.2d at 1073–75).

Plaintiffs contend that defendants had an understanding "to participate in a common plan or design to market asbestos-containing materials," and that this "understanding" is supported by certain documentary evidence which has been recognized in several asbestos cases as "sufficient to impose liability against defendants even though the plaintiff could not identify their particular product as the one that caused harm." Pl. Memo at 34–35, Exhibits 1 and 2. However, these documents pertain primarily to Johns–Manville and provide no evidence that the defendants in these cases acted in concert to commit a tortious act. Instead, plaintiffs claim that additional discovery may lead to more concrete evidence of the defendants' individual and joint involvement to suppress information. *Id.* at 36, n. 12.

It is clear, however, that concert of action liability is not available to plaintiffs under New York law. The Court of Appeals refused to apply the concert of action theory in two recent product liability cases: *Hymowitz,* 541 N.Y.S.2d at 946, 539 N.E.2d at 1073 (involving DES) and *Rastelli,* 582 N.Y.S.2d at 376, 591 N.E.2d at 225 (involving the explosion of a multipiece tire rim). Moreover, the New York Supreme Court has refused to apply this theory to an asbestos-in-building case, noting that it knew of no case which would "extend the doctrine to a cause of action for economic loss." *Solow v. W.R. Grace & Co.,* 591 N.Y.S.2d 679 (N.Y.Sup.Ct. 1989).

In *Hymowitz,* the court held that the concert of action theory is applicable only where "the precise identification of a wrongdoer is impossible." *Hymowitz,* 541 N.Y.S.2d at 945, 539 N.E.2d at 1073. In the cases at hand, however, identification of the wrongdoer is not only possible, but scientific analysis has also failed to identify any of the products at issue as those of the defendants. As the California Supreme Court stated in rejecting this theory in *Sindell:*

> [a]pplication of the concept of concert of action to this situation [a DES case] would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, *even if it could be demonstrated that the product which caused the injury was not made by the defendant.*

*Sindell,* 607 P.2d at 933 (emphasis added).

Plaintiffs have also failed to identify all, or even a majority of the alleged wrongdoers. Courts that have considered the concert of action theory have expressed concern about the fairness of holding a small number of defendants jointly liable for the conduct of an entire industry. *Marshall v. Celotex Corp.,* 691 F.Supp. 1045, 1048 (E.D.Mich.1988) ("Without proof that these four manufacturers comprise a majority of the asbestos prod-

---

52. *See supra* pp. 17–28.

ucts industry, it would be highly inequitable to hold these four defendants legally responsible for decedent's injury when there is absolutely no showing that any of them supplied asbestos-containing products to the naval station."); *Hannon v. Waterman S.S. Corp.*, 567 F.Supp. 90, 92 (E.D.La.1983); *Starling v. Seaboard Coast Line Railroad Co.*, 533 F.Supp. 183, 188–91 (S.D.Ga.1982); *Hymowitz*, 541 N.Y.S.2d at 948, 539 N.E.2d at 1076 ("[I]t potentially renders small manufacturers, in the case of DES and in countless other industries, jointly liable for all damages stemming from the defective products of an entire industry.")

## C. Enterprise Liability

Plaintiffs also ask this Court to adopt a theory of enterprise liability in these cases. Pl. Memo at 40–43. This theory, which was first recognized in *Hall v. E.I. Dupont de Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y. 1972), is similar to the concert of action theory in that it relieves plaintiffs of the burden of product identification by recognizing the defendants' joint activity as the proximate cause of plaintiffs' injury.

In support of their proposition that enterprise liability is a viable theory in asbestos-in-building cases, plaintiffs cite two cases. One of these cases, *Dombroff v. Armstrong Cork Co.*, No. 79–14048 (12) (Fla., Dade Co., Cir.Ct., Aug. 3, 1981) was subsequently overturned in an oral order from the bench. *See* Pl. Memo at 40, n. 17. The other case expressly declined to rule on the applicability of enterprise liability in an asbestos personal injury action. *Prelick v. Johns–Manville Corp.*, 531 F.Supp. 96, 98 (W.D.Pa.1982).

On the other hand, numerous courts have rejected the application of enterprise liability in asbestos cases. *Marshall v. Celotex Corp.*, 651 F.Supp. 389, 394–95 (E.D.Mich.1987); *Vigiolto v. Johns–Manville Corp.*, 643 F.Supp. 1454 (W.D.Pa.1986), *aff'd without opinion*, 826 F.2d 1058 (3d Cir.1987); *Lillge v. Johns–Manville Corp.*, 602 F.Supp. 855, 856 (E.D.Wis.1985); *Baltimore v. Keene Corp.*, No. 84268068/CL25639 (Baltimore Cir. Ct.1990).[53]

Enterprise theory is unsuited to an asbestos-in-building case because there exists a multitude of asbestos-containing products and a multitude of possible defendants. As the *Hall* court noted in its leading decision, the application of enterprise liability to a decentralized industry might be "manifestly unreasonable." *Hall*, 345 F.Supp. at 378; *see also Lillge*, 602 F.Supp. at 856 (enterprise liability is inapplicable to an asbestos case where "the number of potential defendants is so great that the assumption that all the defendants jointly controlled the risk of injury is weak."). The rationale for this requirement is that enterprise liability is premised upon a manufacturer's joint control of the risks, and each firm's control over industry risks will likely dissipate as the number of firms in an industry increases. *See Hall*, 345 F.Supp. at 376–78.

Moreover, in order to succeed on this theory, plaintiffs must first prove by a preponderance of the evidence that one of the named defendants manufactured the injury-causing product. *Hall*, 345 F.Supp. at 379; *see also Marshall*, 651 F.Supp. at 394 ("Enterprise liability exists where it can be proved that plaintiff's injury was caused by at least one of a group of manufacturers of a particular product * * *.") Plaintiffs, however, have not proved that a single named defendant manufactured any of the products at issue.[54]

In any event, even if enterprise liability were applied in these cases, plaintiffs would merely "be entitled to a shift of the burden of proof." *Hall*, 345 F.Supp. at 380. Since defendants have proved that they did not manufacture any of the products at issue, plaintiffs could not recover under this theory.[55]

## D. Alternative Liability

Plaintiffs ask this Court to apply an alternative liability theory in these cases. Pl.

**53.** A copy of this memorandum and order is annexed to this Report as Appendix L.

**54.** *See supra* pp. 13–17.

**55.** *See supra* pp. 17–28.

Memo at 44–47. This theory, which originated in *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948), *overruled by Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), provides that "[w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm." Restatement (Second) of Torts § 433B(3) (1965) (codifying the *Summers* rule).

There are two principal justifications for shifting the burden of proof and imposing liability under this theory. First, because the theory imposes liability only upon defendants proven to have acted tortiously, the defendants are morally blameworthy and are justifiably held liable. Second, without the device of burden-shifting, all defendants might remain silent and the innocent plaintiff would be denied a remedy while proven wrongdoers escape liability. Application of this theory is particularly appropriate when the number of defendants is small, because the probability that any one of them caused the harm is significant enough to assess moral blame.

Alternative Liability theory is inapplicable to this case for several reasons. First, this theory requires that a plaintiff be able to show that at least one of the defendants it has joined actually caused the injury; plaintiffs have not shown that *any* of the defendants in these actions caused the injury.[56]

Second, this theory requires that all possible defendants be joined. *Gaulding v. Celotex Corp.,* 772 S.W.2d 66, 69 (Tex.1989) ("A crucial element to alternative liability is that *all* possible wrongdoers must be brought before the court."); Restatement (Second) of Torts, *supra,* § 433B(3), comment h. However, plaintiffs admit that they have not joined all possible defendants. Pl. Memo at 47. Therefore, there is no guarantee that the actual wrongdoer is before the court.

Third, this theory is merely a burden shifting device. Since defendants have shown that they did not manufacture the products at issue, plaintiffs would not be entitled to recover on this theory.[57]

New York Courts have never applied an alternative liability theory to a DES or an asbestos case. In rejecting the application of this theory to a DES case, the New York Court of Appeals stated that:

alternative liability rests on the notion that where there is a small number of possible wrongdoers, all of whom breached a duty to the plaintiff, the likelihood that any one of them injured the plaintiff is relatively high, so that forcing them to exonerate themselves, or be held liable, is not unfair.

*Hymowitz,* 541 N.Y.S.2d at 946, 539 N.E.2d at 1073 citing *Sindell,* 607 P.2d at 931. The *Hymowitz* Court further reasoned that "while it may be fair to employ alternative liability in cases involving only a small number of potential wrongdoers, that fairness disappears with the decreasing probability that any of the defendants actually caused the injury." *Id.*

Furthermore, numerous courts have rejected the alternative liability theory in asbestos cases. *Thompson v. Johns–Manville Sales Corp.,* 714 F.2d 581, 582–83 (5th Cir. 1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984) (rejecting alternative liability theory in the absence of joinder of all possible defendants because application of theory "would beg the question of causation entirely."); *Marshall v. Celotex Corp.,* 651 F.Supp. at 392; *Vigiolto v. Johns–Manville Corp.,* 643 F.Supp. at 1457; *Baltimore v. Keene Corp.,* No. 84268068/CL25639 (Baltimore Cir.Ct.1990).

The only cases cited by plaintiffs in support of the application of alternative liability theory in an asbestos-in-building case involve Michigan law. The first case, *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 343 N.W.2d 164, *cert. denied,* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984), is a DES case. The second case did not address the issue of alternative liability, as plaintiffs contend, but ad-

---

**56.** *See supra* pp. 13–17.

**57.** *See supra* pp. 17–28.

dressed and rejected the application of concert of action liability. *Marshall v. Celotex Corp.*, 691 F.Supp. at 1046, 1048 (defendants were previously granted summary judgment on plaintiff's theory of alternative liability). In the third case, *Board of Education v. Celotex Corp.*, No. 84–429634NP (Mich.Cir. Ct. Feb. 1, 1988), the court denied defendants' motion for summary judgment on alternative liability, and left open the possibility that the plaintiff would be able to meet the requisite elements of alternative liability, namely that: (1) at least one defendant was responsible for the injury; (2) all potential defendants were joined; and (3) defendants would be unable to exonerate themselves. As noted above, plaintiffs have failed to satisfy any of these elements.

### E.  Concurrent Cause Liability

Plaintiffs request that this Court consider these actions under a concurrent cause liability theory. Pl. Memo at 48–50. This theory applies where two or more tortfeasors' actions combine to produce an indivisible injury to a plaintiff. This theory differs from alternative liability in that, unlike alternative liability which assumes that only one of the named defendants caused the specific harm to the plaintiff, the concurrent cause doctrine proceeds from the assumption that more than one defendant substantially contributed to the plaintiff's injury. Thus, under concurrent cause liability, all those who are subsequently found liable will have been found to have caused at least some harm to the plaintiff. Accordingly, the Tenth Circuit has reasoned that "if all or substantially all of the *available* and identifiable, implicated manufacturers are before the court, and if some of these defendants can be shown to have each contributed some harm at a possibly substantial level, then all potential defendants need not be before the court." *Menne v. Celotex Corp.*, 861 F.2d 1453, 1466 (10th Cir.1988). Under this theory of liability, liability is joint but not several. *Id.* at 1469.

Plaintiffs assert that New York "readily accepts concurrent causes of liability." Pl. Memo at 48, n. 19 (citing *Codling v. Paglia*, 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973); *Hughes v. Ataka America, Inc.*, 48 A.D.2d 808, 369 N.Y.S.2d 723 (1st Dep't 1975)). However, none of the cases plaintiffs look to for support are asbestos cases.

Plaintiffs' reliance on *Menne*, an asbestos personal injury case applying Nebraska law, is similarly misplaced. Under the *Menne* theory of liability, plaintiffs must prove that: (1) all or substantially all of the available and identifiable, implicated manufacturers are before the court; and (2) some of these defendants can be shown to have contributed *some harm*.

In the cases at hand, plaintiffs have failed to meet either of these requirements. Although plaintiffs state that they have sued "the majority of manufacturers responsible for the marketing of asbestos-containing materials for use in buildings," Pl. Memo at 47, they do not claim to have sued all or substantially all of the available and identifiable, implicated manufacturers. Moreover, even if plaintiffs did meet this requirement, they clearly fail to meet the second requirement because they have failed to show that any of the named defendants caused any harm.

Finally, even if plaintiffs met the first two requirements, the defendants have already met their burden of showing that they did not produce substantial harm to the plaintiffs. Therefore, even if this Court were to extend the concurrent cause doctrine to asbestos-in-building cases, plaintiffs would be unable to recover on this theory.

### F.  Civil Conspiracy

Although plaintiffs assert that the tort of civil conspiracy provides an avenue of recovery, they also admit that New York courts do not recognize such a claim. Pl. Memo at 54. However, they argue that the "approach taken by the Delaware Courts should be accepted here." *Id.* at 56.

Under the conspiracy theory of liability, two or more persons must combine to accomplish an unlawful purpose or a lawful purpose by unlawful means, and such conspiracy must result in damages in order to be actionable. *Nutt v. A.C. & S. Co.*, 517 A.2d 690, 694 (Del.Super.Ct.1986). Conspiracy is not an independent cause of action in Delaware, but

instead requires an underlying wrong (such as intentional misrepresentation) which would be actionable absent the conspiracy. *Id.* In applying this theory to asbestos litigation, the Delaware courts have stated that a plaintiff must establish that: (1) the defendants are members of an asbestos-manufacturing conspiracy; (2) one of these defendants, acting in furtherance of the conspiracy, intentionally misrepresented the harmful effects of asbestos in order to induce plaintiffs to continue their exposure; and (3) the plaintiffs were injured as a result of the defendants' unlawful acts. *See Nicolet, Inc. v. Nutt,* 525 A.2d 146, 150 (Del.1987).

New York courts, however, have consistently refused to recognize civil conspiracy as a cause of action. *See Valdan Sportswear v. Montgomery Ward & Co.,* 591 F.Supp. 1188, 1191 (S.D.N.Y.1984) ("As plaintiff acknowledges, 'in New York there is no substantive tort of civil conspiracy.' "); *Green v. Davies,* 182 N.Y. 499, 75 N.E. 536 (1905) (plaintiff's claim that in pursuance of the alleged conspiracy, defendants slandered the plaintiff and maliciously instituted an action, did not state a claim for conspiracy but rather stated two distinct claims, one for slander and another for malicious prosecution); *Mackie v. LaSalle Industries, Inc.,* 92 A.D.2d 821, 460 N.Y.S.2d 313, 316 (1st Dep't 1983) (court dismissed the conspiracy claim where defendants allegedly conspired to interfere with an employment contract by improperly transferring plaintiff's accounts to others); *ABKCO Industries, Inc. v. Lennon,* 52 A.D.2d 435, 384 N.Y.S.2d 781, 784 (1st Dep't 1976); *Goldstein v. Siegel,* 19 A.D.2d 489, 244 N.Y.S.2d 378, 382 (1st Dep't 1963) (court dismissed the conspiracy claim and held unequivocally that "[t]here is no substantive tort of conspiracy"). Moreover, New York courts have specifically declined to recognize a civil conspiracy cause of action in asbestos-in-buildings cases. *Solow v. W.R. Grace & Co.,* 591 N.Y.S.2d 679 (N.Y.Sup.Ct.1989) ("[t]here is no substantive tort of civil conspiracy in New York").

In sum, I find that plaintiffs may not defeat summary judgment based upon alternative theories that plaintiffs contend do not require product identification.

### CONCLUSION

I find that the moving defendants have demonstrated that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. I therefore recommend that their motions for summary judgment be granted. I also recommend that the actions be dismissed with respect to the buildings located at 11 Park Place, 25 Park Place, 21 West Street, 79 Madison Avenue, 183 Madison Avenue, and 120 East 23rd Street, based upon plaintiffs' failure to provide any samples from those buildings. I further recommend that the actions be dismissed against those defendants that have not been served, *see supra* note 2, pursuant to Fed.R.Civ.P. 4(j). Finally, with respect to those defendants that have been served but never appeared,[58] I recommend that the actions be dismissed unless plaintiffs file a motion for entry of a default judgment no later than December 31, 1992.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Vincent L. Broderick, White Plains Courthouse, and to the chambers of the undersigned, Room 631. Any requests for an extension of time for filing objections must be directed to Judge Broderick. *Failure to file objections may result in a waiver of those objections for purposes of appeal. Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir. 1983).

DATED: New York, New York

December 9, 1992

58. Forty–Eight Insulations, Inc.; Cape Asbestos; Atlantic Asbestos; York Insulation; MBC Corp., Successor to Matthew Ballick; King Insulation; Magnesia Asbestos; ABCO Insulation; Insulcoustic; and Insulation Materials Corporation.

152

Respectfully submitted,

/s/ Kathleen A. Roberts

KATHLEEN A. ROBERTS
United States Magistrate Judge